IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Superior Production
Partnership, d/b/a PBSI,         :

    Plaintiff,                   :

  v.                               :    Case No. 2:06-cv-0916

Gordon Auto Body Parts Co.,      :    JUDGE SMITH
Ltd., et al.,
                                 :
    Defendants.


<u>OPINION AND ORDER</u>

    This predatory pricing case is before the Court to consider a motion to compel production of documents filed by plaintiff Superior Production Partnership. Plaintiff does business as PBSI and the Court will refer to it by that name in its opinion and order. The motion to compel was originally filed on January 4, 2008, but was supplemented after depositions were taken and is now fully briefed. This Opinion and Order constitutes the Court's ruling on the motion to compel.

I.

    PBSI is in the business of manufacturing and selling replacement hoods for the automobile industry. Its primary claim in this case is that, after it entered that market, Gordon, a competitor in the market, lowered its prices below cost in order to drive PBSI out of the market. The predatory pricing claim relates to four separate types of hoods. PBSI has also asserted a claim involving a fifth hood, designed for a 1997 Ford pickup and having to do with the materials which Gordon used to manufacture that hood.

    Early in the case, the Court had discussions with the parties concerning the production of documents relating to how

much it cost of Gordon to manufacture its replacement hoods.
Some documents were produced after that conference.  However,
Gordon did not produce a number of other documents which have
been requested by PBSI in its document requests.   Six separate
types of documents are addressed by the motion to compel.  The
Court will analyze these requests in the order in which they
appear in PBSI's motion.

A.

The first issue raised by the motion to compel is whether
Gordon should be required to produce documents in their native
electronic format.  The parties agree that Gordon keeps
information in electronic format, but it has produced most of its
documents in hard copy.  PBSI requests, for a number of reasons,
that the documents be produced in their original format.

Gordon's response to this request is that there would be no
purpose served by producing the documents in native format
because Gordon's computer system does not maintain "metadata"
that would provide additional information about the document
beyond that shown on the hard copy.  Neither its responsive
memorandum nor the declaration of Sonny Pan, which is attached to
that memorandum, address the relative ease or difficulty
of producing these documents in native format.

Federal Rule of Civil Procedure 26, as amended, expresses a
preference for the production of electronically stored
information in its native format.   As PBSI points out in its
reply brief, the utility of having documents produced in this
format is not limited to being able to view any metadata which
might be embedded in the electronic document but not visible on
the hard copy.  It is often more convenient for the requesting
party to receive the documents electronically in order to be able
to store them and manipulate them during the litigation process.
Here, there do not appear to be any obstacles to the production

of the documents in native format, and PBSI has articulated at least one good reason to have them produced in that fashion. Under these circumstances, the Court will direct Gordon to produce documents in their native format.

B.

The next issue raised by the motion to compel has to do with whether Gordon should be directed to produce English translations of documents which were originally written in Chinese. PBSI notes that, on Gordon's website, there is a copy of an annual report which has been translated into English, but when Gordon produced this document during discovery, it produced only the Chinese version. Consequently, PBSI seeks an order directing that Gordon produce English translations of any documents which have been so translated.

Gordon's response to this argument is brief. It asserts that the only document which it has translated into English is the 2004 annual report highlights. None of its other business documents have been translated into English. Assuming that to be true, and there is no evidence to the contrary, the Court agrees that any order on this issue must be limited to the single document which has been translated. Gordon will be directed to produce that document if it has not done so already.

C.

The next issue raised by the motion to compel is PBSI's request for backup documentation concerning Gordon's price quotes and other communications to the customers to whom it sold the replacement truck hoods. Gordon has produced a summary of the prices quoted to its customers but not any underlying documentation. Understandably, PBSI would like to see if the backup documentation is consistent with the summary which was produced, and it also argues that emails or other documents which may have been passed back and forth between Gordon and its

customers concerning price quotations may contain information supportive of PBSI's predatory pricing claims.

Gordon's response to this document request focuses on the burden which it would incur were it required to produce these documents. According to Mr. Pan's declaration, there are between 25,000 and 30,000 backup invoices supporting these quotes, it would take at least two weeks to assemble these documents, and the information is completely duplicative of that reflected in the 55-page summary document which was produced.

In its supplemental memorandum, PBSI notes that deposition testimony does not support Gordon's claim that the summary contains all of the relevant price quotation information. Rather, the summary simply shows the prices which customers ultimately paid for the purchase question and not the prices they were originally quoted. Additionally, there may have been agreements between Gordon and its customers which permitted those customers to take discounts not reflected on the summary, so that the price those customers ultimately paid would not be the price on the summary. Further, PBSI argues that one of the deposition witnesses testified that it would be relatively easy to retrieve all of this information from Gordon's electronic database.

In response, Gordon denies that the witness who testified was particularly knowledgeable about how easy or difficult it would be to retrieve this information. Further, Gordon asserts that information that it had quoted a higher price to a customer than the price the customer ultimately paid for the part in question is totally irrelevant to PBSI's predatory pricing allegations. Finally, Gordon repeats its argument that because this information is not particularly relevant, there is no justification for imposing a substantial burden upon it to retrieve it.

The general principles involving the proper scope of

discovery are well known.  The Federal Rules of Civil Procedure authorize extremely broad discovery.  <u>United States v. Leggett & Platt, Inc.</u>, 542 F.2d 655 (6th Cir. 1976), <u>cert. denied</u> 430 U.S. 945 (1977).  Therefore, Fed.R.Civ.P. 26 is to be liberally construed in favor of allowing discovery.  <u>Dunn v. Midwestern Indemnity</u>, 88 F.R.D. 191 (S.D.Ohio 1980).  Any matter that is relevant, in the sense that it reasonably may lead to the discovery of admissible evidence, and is not privileged, can be discovered.  The concept of relevance during discovery is necessarily broader than at trial, <u>Mellon v. Cooper-Jarrett, Inc.</u>, 424 F.2d 499 (6th Cir. 1970), and "[a] court is not permitted to preclude the discovery of arguably relevant information solely because if the information were introduced at trial, it would be 'speculative' at best."  <u>Coleman v. American Red Cross</u>, 23 F.3d 1091, 1097 (6th Cir. 1994).

    Information subject to disclosure during discovery need not relate directly to the merits of the claims or defenses of the parties as long as it relates to any of the myriad of fact-oriented issues that arise in connection with litigating those claims and defenses.  <u>Oppenheimer Fund, Inc. v. Sanders</u>, 437 U.S. 340 (1978).  On the other hand, the Court has the duty to deny discovery directed to matters not legitimately within the scope of Rule 26, and to use its broad discretionary power to protect a party or person from harassment or oppression that may result even from a facially appropriate discovery request.  <u>See Herbert v. Lando</u>, 44l U.S. 153 (1979).  Additionally, the Court has discretion to limit or even preclude discovery which meets the general standard of relevance found in Rule 26(b)(1) if the discovery is unreasonably duplicative, or the burden of providing discovery outweighs the benefits, taking into account factors such as the importance of

the requested discovery to the central issues in the case, the amount in controversy, and the parties' resources. See Fed.R.Civ.P. 26(b)(2). Finally, the Court notes that the scope of permissible discovery which can be conducted without leave of court has been narrowed somewhat by the December 1, 2000 amendments to the Federal Rules. Rule 26(b) now permits discovery to be had without leave of court if that discovery "is relevant to the claim or defense of any party ...." Upon a showing of good cause, however, the Court may permit broader discovery of matters "relevant to the subject matter involved in the action." Id.

In order to prove a case of predatory pricing, a plaintiff is ordinarily required to demonstrate predatory intent. Although that appears to involve a measure of objective evidence, see Henry v. Chloride, Inc., 809 F.2d 1334 (8th Cir. 1987), the reasonable expectations of the party who has engaged in allegedly anti-competitive activity is still a factor. See id. at 1345 n. 9. Thus, it is not out of the question that the actual prices quoted for these replacement parts, in addition to the prices actually paid by Gordon's customers, are relevant to the question of whether Gordon acted with a predatory intent. Further, to the extent that actual prices are the most significant evidence of both predatory pricing and intent, documents such as agreements with customers which would permit the customer to pay a lower price than actually reflected on a summary produced by Gordon are clearly relevant to the predatory pricing claim. Finally, it seems logical to believe that there may be information and communications between Gordon and its customers which also bear on the question of what price was actually paid, and on such issues as whether Gordon would continue to charge those prices in the future or whether it was anticipating price increases after competitors were driven from the market.

Of course, a finding that documents requested are relevant does not necessarily equate to an order compelling their production. Gordon is correct that the burden of producing these documents must be taken into account in determining whether it should be required to produce them, and that the Court is required to compare this burden to the likely benefit to PBSI if the documents are produced. For purposes of making this determination, the Court will take as true Mr. Pan's statement that it would be a fairly substantial effort to assemble all of the backup invoices which support the 55-page summary already prepared.

First, because the burden identified by Gordon relates only to backup invoices, there appears to be no good reason not to direct it to produce any agreements which it has with its customers which would have permitted them to pay a price lower than the price reflected on the invoice and therefore on the summary. Second, it is unclear whether e-mails or other correspondence with customers can easily be retrieved through an electronic system or whether it would take a substantial effort, and involve some type of manual search of customer files, to locate such correspondence. Certainly, to the extent that such correspondence is associated electronically with customer information, it is reasonable to request Gordon to engage in that electronic search and to produce, in native format, any such correspondence. That leaves only the question of what it is reasonable to require Gordon to do with respect to the backup invoices themselves.

The Court is hesitant to require Gordon to produce all of the backup invoices for the transactions in question when there is no evidence in the record about how often the final price paid by the customer differed from the price shown on the summary already produced. On the other hand, the Court is not willing

7

to require PBSI to take the summary at face value in light of the testimony that it may contain some inaccuracies. In order to resolve this issue, the Court will direct Gordon to do the following.

First, PBSI should identify some group of transactions from the summary in its possession which is large enough to serve as a representative sample. The size of the sample should be about 10% of the total transactions. Once that sample has been identified, Gordon shall assemble and produce the backup invoices for that sample. After the parties have had an opportunity to compare the backup invoices with the summary, they will be in a better position to determine whether the price variation about which PBSI is concerned is a relatively frequent occurrence, or whether it happens only rarely. If the former is true, the Court would expect Gordon to produce further backup invoices without the need for an additional order. If the latter is true, it is also likely true that the time and expense required to produce additional invoices will not confer a concomitant benefit upon PBSI and that there would be little justification for requiring Gordon to bear that additional time and expense.

D.

The next discovery issue addressed by PBSI's motion relates to cost documents. That was also the subject of a prior discovery conference with the Court. Although Gordon produced some cost documents, PBSI asserts that the production is deficient in the following respects.

First, none of the documents indicate the formulas used by Gordon to calculate its costs. Second, instead of producing hard copies of invoices or account payable records from its computer system showing its actual costs for the raw materials incorporated into the replacement parts, Gordon simply produced the contracts under which it purchased such materials. PBSI

asserts that without the accounts payable records, it has no way of knowing whether Gordon actually paid the amounts set forth in the contracts.  Finally, PBSI asserts that Gordon did not produce complete information about variable overhead, fixed overhead, and sales expenses, but only summaries of these types of expenses.  PBSI argues that this type of information should be directly retrievable from Gordon's computer system and that it should have access to the information without having to rely on summaries and incomplete documents from which price extrapolations have to be made.

Gordon makes much the same argument with respect to these documents as it did with respect to its pricing documents. Essentially, it contends that the summaries which have been produced are accurate and that it would be a substantial burden for it to produce every document relating to its raw material costs and 16 categories of variable overhead expenses over a four-year period.  It asserts that the volume of documents which would have to be produced in order to satisfy PBSI's request is much greater than the pricing documents, and it cannot even estimate how much time and expense would be required to produce them.  Gordon also asserts that there is no reasonable basis for questioning the accuracy of the documents which it has produced, because the documents have been audited and are reflected in reports disseminated to the public because Gordon is a publicly traded company.  Finally, in its most recent reply memorandum, Gordon contends that the motion to compel is not specific enough in defining what cost documents PBSI is seeking  and that there is "an enormous amount of information" which is potentially responsive to this request.

The Court is troubled by Gordon's assertion that there is an enormous amount of cost information responsive to this request which, apparently, has never been produced.  Ordinarily, a party

responding to legitimate and relevant discovery requests may not produce only summaries of the requested information while denying access to underlying documentation by saying, essentially, "Trust us." Further, the Court does not agree that PBSI has not reasonably described the category of documents which it wishes to see. Any company in the manufacturing business is presumably aware of the documentation which it keeps concerning the costs of the product it sells. If that were not so, the company would have difficulty determining whether it is pricing the item appropriately and whether it is making a profit. The fact that Gordon is able to produce summaries of the cost of materials which go into the replacement parts at issue indicates that it is well aware of the type of documentation which could be reviewed in order to determine whether the summaries have been accurately compiled.

    The Court is further concerned with PBSI's assertions, in its most recently-filed memorandum, that some of the summaries use average rather than actual costs and that there is uncertainty about the periods of time covered by various cost calculations which have been produced. It would seem likely that, in order to attempt to prove its claims, PBSI will wish to compare Gordon's costs of goods sold against the price charged for those goods at particular points in time. If PBSI is limited to information which simply reflects average costs spread out over unidentified time periods, it will be very difficult for it to analyze this matter with any precision. Also, as with the pricing documents, PBSI is entitled to do some comparison of the documents from which the summaries have been drawn with the summaries themselves to satisfy itself that the summaries are accurate, or to identify the frequency with which the summaries do not reflect information correctly from the documents which were purportedly used to prepare them.

    That said, the Court is not convinced that PBSI is entitled to every single piece of paper generated by Gordon over the

relevant time period which relates to the costs of the products at issue.  It is somewhat unfortunate that the Court does not have more specific information about exactly what types of documents Gordon keeps and how easy or difficult it is to gain access to those documents, especially if they are maintained in electronic format.  That is certainly a subject which could have been explored at deposition, and the parties' briefings on this issue do not reveal a great deal of information on this subject. Additionally, it would have been helpful, for example, to have input from PBSI's expert witnesses explaining why (if it is true) that they are unable to do a precise calculation of Gordon's costs based upon the information which has already been produced and how the production of additional documents would assist them. Thus, the Court is left to make a fairly general ruling with respect to whether additional documents need to be produced.

Conceptually, this issue is not much different from the question of whether Gordon should be required to produce additional documents relating to the sales of the parts.  Given the parties' arguments, the Court concludes that the most important function of the additional discovery is to allow PBSI to determine whether the cost information which it already has is accurate.  This, like the pricing issue, strikes the Court as essentially an auditing question.  In other words, the entire volume of backup documentation would probably not have to be produced in order for someone to make a reliable determination about the accuracy of the summary information which has already been produced.  Not knowing the precise scope of how much underlying documentation needs to be checked, however, the Court will simply order the parties to confer about this subject with the understanding that (1) PBSI must use its best efforts to identify a reasonable volume of backup documentation which it believes, in good faith, to be necessary in order to allow it to verify or dispute the accuracy of the summary information produced, and (2) Gordon will respond to any reasonable request

for access to the backup documentation.  If the documentation is available in electronic format, Gordon should produce it in that fashion.

E.

The next substantive matter at issue between the parties relates to the Gordon replacement hood for a 1997 Ford pickup. By way of background, the parties agree that the pricing of the 1997 Ford pickup replacement hood is not alleged to have been predatory.  However, PBSI has asserted both federal and state claims alleging deceptive trade practices concerning this hood. In particular, PBSI contends that Gordon was aware that the aluminum used to manufacture this hood did not meet the standards of the Certified Auto Parts Association.  Therefore, it asked Gordon to produce documents which would show the type of aluminum which Gordon purchased to manufacture this hood.  Gordon asserts that this information is irrelevant because PBSI has already learned from CAPA all it needs to know about the certification of the hood and because the grade of aluminum used by Gordon to manufacture it is irrelevant to the certification process. Gordon argues that it is the manufacturing process itself, rather than the quality of aluminum, which determines whether the hood will meet appropriate standards.  In its most recent memorandum, PBSI disputes that factual assertion and indicates that at some point Gordon changed the type of aluminum it used for this part to a grade which was far different from the OEM specifications. Consequently, PBSI claims that it needs to see various bills of material for this part to confirm the change in the grade of aluminum being used in the manufacturing process.

At this point in the case, it is difficult for the Court to know exactly how the grade of aluminum used to manufacture this hood relates to the question of whether it either met or did not meet the appropriate certifications or whether there was something deceptive about the way in which Gordon was manufacturing the hood.  Because PBSI's request for information

about this hood now appears to be more limited than its original request, and appears to cover only those bills of material which would confirm that Gordon switched the grade of aluminum from the one used when it created this part originally to some different grade, the Court will grant the motion with respect to that type of documentation.

F.

The last discovery issue (other than a procedural issue, which will be addressed below) relates to certain agreements between Gordon and its competitors. The parties appear to have a fundamental disagreement concerning the nature of these documents.

PBSI originally requested documents which would show whether there were any agreements among four different companies related either to pricing of hoods, sharing tooling for the production of these hoods, or limiting competition in certain geographic areas. In response, Gordon stated that it had no joint tooling agreements relating to the hoods at issue in this case. In its most recent filing, PBSI asserts that Mr. Pan admitted in his deposition that such agreements do exist and that he had already collected them and given copies to counsel. If that were true, it would not be burdensome for Gordon to produce these same agreements to PBSI.

Gordon asserts in its most recent memorandum that although it is a party to a number of tooling agreements, none of those agreements involve any of the five hoods at issue in this case. There are apparently production agreements which were discussed during the depositions taken in Taiwan, but these are not tooling agreements. Consequently it reiterates that its initial statement concerning the lack of relevant tooling agreements is accurate.

It is difficult for the Court to determine whether Gordon has met its obligation to produce documents responsive to this request. Certainly, to the extent that the request asks for

tooling agreements, the deposition testimony cited by Gordon in its most recent filing appears to confirm that no relevant tooling agreements exist.  On the other hand, the original request is not limited to tooling agreements but also asks for pricing agreements and agreements which might limit competition.  The Court cannot tell whether the production agreements referred to in the deposition testimony were produced, although it appears likely that they were.  Neither of the most recent filings mentions agreements the purpose of which was to limit competition in specific geographic areas.  Therefore, the Court also assumes either that any such agreements have already been produced, or that they do not exist.  Thus, it does not appear that there are any additional responsive documents which should be produced to PBSI in response to this request.

II.

PBSI's motion also raises a procedural issue concerning Gordon's responses to its document requests.  It argues that Gordon should be directed to provide a certification by counsel that Gordon's files have been searched thoroughly and that the documents produced are the result of such a thorough search.  In its various memoranda, it cites testimony from Gordon representatives to the effect that Gordon may not have been diligent in causing all of its files to be searched.

The Court does not read this testimony to indicate a fundamental flaw in the way in which Gordon went about looking for its documents.  Further a written response to a document request signed by trial counsel is, in fact, a certification that counsel and the client, together, have made a diligent search for responsive documents.  PBSI has not identified with any particularly, beyond those categories of documents discussed above, documents which it believes to exist and which have not been produced to it.  The Court will therefore not direct that any additional certification concerning how Gordon located and assembled its responsive documents occur.  Nevertheless, because

Gordon has been on notice for some time that PBSI questions the adequacy of Gordon's efforts to locate and produce documents, should those efforts prove in the future to have been inadequate, the Court may well consider whether sanctions are appropriate.

III.

Based on the foregoing, the Court grants the motion to compel (#45) as follows.  Within 15 days, Gordon shall produce in native format any documents which it stored electronically and which it has already produced in this litigation in hard copy form.  Within that same time frame, Gordon shall produce the English translation of the business document described in Section I(B) of this order if it has not done so already.  It shall also produce any agreements with its customers which permitted them to pay a price lower than the price reflected on summary documents already produced.  Finally, it shall produce any correspondence with customers maintained in electronic format relating to the prices which customers paid for the four replacement of hoods at issue, and it shall produce a sufficient quantity of bills of material for the Ford pickup replacement hood to allow PBSI to determine when Gordon changed the grade of aluminum used to make that hood.

Within the same 15 day period, counsel shall confer concerning the rest of the matters addressed above.  In particular, they shall discuss how to implement the Court's order directing Gordon to make available for inspection backup documentation for the summaries of prices which it has produced as well as its cost summaries.  The parties shall discuss in good faith how much backup documentation with respect to each set of summaries is reasonable to produce, and to the extent that this information exists in electronic format, PBSI shall be entitled either to inspect it in that format, or Gordon shall produce it in that format.  If the results of these "auditing" efforts reveal substantial discrepancies between the summary information and the backup documents, the parties shall confer in good faith

about further discovery of backup documentation.  If they are unable to resolve that issue, they shall contact the Court for a conference.

                                   IV.

Any party may, within ten (10) days after this Order is filed, file and serve on the opposing party a motion for reconsideration by a District Judge.  28 U.S.C. §636(b)(1)(A), Rule 72(a), Fed. R. Civ. P.; Eastern Division Order No. 91-3, pt. I., F., 5.  The motion must specifically designate the order or part in question and the basis for any objection.  Responses to objections are due ten days after objections are filed and replies by the objecting party are due seven days thereafter.  The District Judge, upon consideration of the motion, shall set aside any part of this Order found to be clearly erroneous or contrary to law.

This order is in full force and effect, notwithstanding the filing of any objections, unless stayed by the Magistrate Judge or District Judge.  S.D. Ohio L.R. 72.4.

                                        /s/ Terence P. Kemp
                                        United States Magistrate Judge